J. F. BAKER v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY and GRANT MARSH, Appellants.—39 S. W. (2d) 535.

Division One, May 21, 1931.*.

*NOTE: Opinion filed at October Term, 1930, March 31, 1931; motion for rehearing filed; motion overruled at April Term, May 31, 1931.

*H. B. Pyle, Dudley & Brandom, J. C. Leopard* and *J. G. Trimble* for appellants.

*Pross T. Cross, L. B. Gillihan* and *Gerald Cross* for respondent.

SEDDON, C.—Action under the Federal Employers' Liability Act to recover damages for personal injuries alleged to have been suffered by plaintiff on September 16, 1926, while he was employed as a laborer by the defendant railroad carrier and was engaged in interstate commerce, and which injuries are alleged to have proximately and directly resulted from the negligence and carelessness of the defendant railroad carrier and its foreman, the defendant, Grant Marsh.

The petition alleges, in substance, that plaintiff and the defendant railroad carrier were both engaged in interstate commerce at the time of plaintiff's injuries; that plaintiff was in the employ of defendant railroad carrier as a section laborer, and, at the time of his injury, was engaged in repairing and maintaining the track and roadbed of the defendant railroad carrier at a point a few miles west of defendant's railroad station at Osborn, Missouri; that the defendant, Grant Marsh, was the section foreman of defendant railroad carrier in charge of said work, and that plaintiff was working under the immediate direction and orders of said foreman, Grant Marsh; that plaintiff was ordered and required to be, and to stand upon, a certain flat car on defendant's railroad track, and to assist in the work of piling railroad ties on said flat car, which railroad ties were to be unloaded at other points along said railroad track, in the vicinity of the place where plaintiff was at work, for the immediate purpose of being used in repairing and rebuilding said railroad track; that "while plaintiff was so engaged in said piling

of said ties on said flat car, and while plaintiff was on said car and on said ties, the defendant Grant Marsh, then and there acting in the line of his said duties to defendant railroad, and directing and supervising said work, also on said car and ties, carelessly and negligently did jostle, run against, step and move against the plaintiff, and plaintiff was thereby, and as a direct and proximate result thereof, caused to fall from said pile of! ties on said car onto the ground, with great force and violence, and thereby and by reason of said fall, caused to undergo and receive great and permanent injuries.''

The defendant railroad carrier filed answer, admitting its incorporation under the laws of the State of Illinois, and its operation of a line of railroad from Chicago, Illinois, through various and several counties of the State of Missouri, and denying generally each and every other allegation of the petition. The individual defendant, Grant Marsh, filed answer, denying generally the allegations of the petition.

After the cause was called for trial in the circuit court and after a jury had been sworn to try the issues, plaintiff asked leave of the court to amend the petition by interlineation, by inserting the word ''push'' after the word ''jostle'' in the causal charge of the petition. The defendants objected, at the time, to the making of said amendment to the petition, which objections were overruled by the court, and plaintiff was granted leave to make said amendment, by interlineation, so that the causal charge of the petition, as so amended. read: ''The defendant, Grant Marsh, then and there acting in the line of his said duties to defendant railroad, and directing' and supervising the said work, also on said car and ties, carelessly and negligently did jostle, *push*, run against, step and move against the plaintiff, and plaintiff was thereby, and as a direct and proximate result thereof, caused to fall from said pile of ties on said car onto the ground, with great force and violence,'' etc. Thereupon, the defendants filed separate motions to strike out the (italicized) word ''push,'' interlined in the petition as an amendment thereto. upon the ground that the interlineation of the said word ''push,'' and the amendment of the petition by including said word, entirely changed the plaintiff's cause of action, and thereby stated a new and different cause of action from that originally stated in the petition, and amounted to a departure from the cause of action originally stated. The trial court overruled the defendants' motions to strike out the word ''push'' from the petition as so amended. whereupon the defendants filed their separate affidavits of surprise, and each defendant made written application for a continuance. upon the grounds that defendants, because of such amendment to the petition, were not ready to proceed with the trial, and were not pre-

pared to meet the cause of action as stated in the amended petition. The trial court denied the application for continuance, and each of the defendants took and saved an exception to the ruling and action of the court.

The plaintiff testified that he was a member of a gang of thirty-five or forty men who were engaged in gathering new ties which were distributed alongside defendant railroad company's track, and in loading the new ties upon a train of flat cars, to be transported to other points along the railroad track for use in replacing decayed and rotten ties which were being removed from the railroad company's main line track. Plaintiff, with other employees of the defendant railroad company, was working aboard one of the flat cars, being engaged in placing the ties in piles upon the floor or bed of the car, as the ties were loaded upon the flat car by the men who were gathering them off the ground. The ties were being placed upon the flat car in piles, several ties deep, and were being put into two piles, situate at the opposite ends of the flat car. The railroad company's foreman, Grant Marsh, was stationed upon the flat car aboard which plaintiff was at work, overseeing and directing plaintiff and his fellow-employees in the work of loading the said car, and of piling the ties at each end of the car. When receiving a tie from the men who were working upon the ground, plaintiff stood upon the floor or bed of the car; and when placing a tie upon the pile, he stood upon the top layer of the pile. Plaintiff testified that he had placed some four or five layers of ties upon one of the piles, situate at the east end of the car, when the circumstance occurred which resulted in his injury.

Respecting the facts and circumstances upon which plaintiff predicates his cause of action and right of recovery, plaintiff testified as follows (Direct examination) :

"Q. While you were engaged in that work there, did Grant Marsh (foreman) say anything to you? A. Yes, sir.

"Q. Tell the jury what he said. A. Well, there was a tie that didn't suit him in this pile, and he told me that, 'You son-of-a——, come and put that tie where I told you.'

"Q. And what did you do? A. I put the tie where he wanted it.

"Q. Did you say anything to him? A. I told him that he had ought to be ashamed to call me such names as that.

"Q. Then what did he do? A. Well, he says, 'If you can't do no better, get on the ground.'

"Q. And when he said that, did he do anything, did he touch you? A. He brushed against me on top—I was on top of these ties at the time—and he brushed and rushed up and brushed against me, and that is when I fell off of the car.

"Q. And as he said, 'Get on the ground?' A. Yes, sir; he said that. . . .

"Q. Now, Mr. Baker, tell the jury, while you were there on the ground after you had fallen off there, with your foot injured and hurting you, did Grant Marsh come to you and talk to you? A. Yes, sir.

"Q. Just tell the jury what he said when he came to you, while you were sitting there with your injured foot. A. Well, he said he was sorry that he had done that, but he didn't aim to do that. It was an accident that he done that.

"Q. That was the defendant, Grant Marsh? A. Yes, sir. . . .

"Q. Tell the jury whether you struck at him (Marsh) at that time, or attempted to hit him, or hit him, or anything about it. A. I did not.

"Q. Did you have any altercation with him? A. No, sir."

Cross-examination: "Q. You don't mean to tell this jury that Mr. Marsh just wilfully and on purpose pushed you off the car, do you? A. No, sir; no, I do not.

"Q. How did he happen to come running against you? A. Well, he was out of humor that day, that morning. Well, he run by me and brushed me off.

"Q. With his hand? A. Well, he run against me.

"Q. Did he push his hand against you? A. No, I don't think so.

"Q. What part of his body struck you? A. Well, I couldn't say. Just kind of brushed against me, and, of course, these ties were slick there.

"Q. And he was angry? A. Yes, sir.

"Q. And had pushed you, you say? A. Yes, sir.

"Q. And you never cursed him? A. No, sir.

"Q. You never approached Grant Marsh and asked him what the hell was the matter with him, did you? A. No, sir.

"Q. Never at any time, or used that expression, nor never went towards Marsh? A. No, sir.

"Q. At no time on the car there, immediately before you fell from the car? A. No, sir.

"Q. And you don't think now that Mr. Marsh intended to push you off the car? A. I don't think so. I think it was accidental.

"Q. Did you think so at the time? A. I rather think, yes, I kind of thought so.

"Q. Right then? Why, what did you call him when you lit on the ground? A. I didn't call him nothing at that time.

"Q. Why did you pick up a big clinker to throw at him, if you thought it was just purely accidental on the part of Mr. Marsh? A. Well, I picked up that clinker because it was—broke my foot.

"Q. Do you mean to tell this jury that, at no time after you fell from that car to the ground, you didn't pick up a large cinder and threaten to throw? A. No, sir.

"Q. Nor you never did? A. No, sir.

"Q. And that you did not call him some name? A. No, sir; I did not.

"Q. And you made no remark to him there after you fell to the ground? A. Not right at that time. I did afterwards.

"Q. Yes. And you made no effort to pick up a cinder to hurl at him after you fell from that car? A. No, not at him.

"Q. Who were you going to throw at? A. I didn't know, as I was going to throw it at anybody.

"Q. And you were not angry at him? A. I was at first; yes, sir.

"Q. And why? A. Because he pushed me off that (car) and broke my foot.

"Q. But you thought he didn't do it purposely? A. Well, I didn't know whether, I wasn't sure whether he did, or not, but I kind of thought he did.

"Q. And, you were not sure at the time whether he purposely pushed you off, or not? A. No. Q. Were you? A. I didn't hardly think he did. Q. But you are not sure of that now, are you? A. No. Q. And you would not tell this jury that he did not purposely push you off, would you, now? A. Well, not for sure, no. Q. It might be that he pushed you purposely because of his anger at you for something that had transpired between you? A. I hardly think so. Q. But you are not positive about that; you would not say now that it was purely accidental? A. No, I don't know as I could say that. . . .

"Q. Your work of placing the tie was done, wasn't it, before you fell off the car? A. No, sir; we wasn't done. Q. I mean this particular tie you were placing, over which you said there was some argument. And you had left the tie? ·A. Yes, sir. Q. You had placed it as he (Marsh) wanted it? A. Yes, sir. Q. And had gone away from it, and had completed that particular work? A. Yes. Q. And was standing on the car, not handling any tie, at the time he brushed against you, as you say, and knocked you off? A. I was going over the tie, on top of the ties. Q. And was through with that particular work over which you had the argument? A. Yes, sir. Q. And were not doing anything in connection with it at the time you were brushed from the car? A. Not with that one; no sir.

"Q. Going back to this particular time on which you said Marsh showed some spirit because you had not placed it (the tie) properly, of what did he complain when you placed that tie? A. Didn't suit him. Q. In what way? A. Well, he thought it shook too much.

Q. That is, it wasn't placed securely on the other ties? A. Well, I suppose so. Q. That was it, wasn't it, Mr. Baker? A. I suppose so. Q. And what he wanted was for you to place it so that it would not rock, or any one step on it that it would not cause them to fall? Wasn't that it? A. Well, I suppose it was. . . .

"Q. Where, with reference to the middle of the car, was Mr. Marsh standing at the time you were placing this tie and he reproached you about the manner in which you had placed it? A. Well, he was standing about in the center of the pile; somewheres in there. Q. Well, where would the center of this pile of ties be, with reference to the center of the car? A. There was a pile on each end of the flat car; that is, back a piece up right from the end. Q. The ties were piled at either end, leaving a space in the middle, is that right, Mr. Baker? A. Yes. Q. And where, with reference to the center of the car, would you be placing this tie? A. It was right here in the middle of the pile. On the east pile. We were on the east pile. . . . Q. On the east end of this flat car? A. Yes, sir. Q. Where was Grant Marsh standing with reference to that pile on which you—A (interrupting). He was standing right on the north side here. He was facing me there. . . .

"Q. You would be standing, at the time, or just immediately before you fell off, about four feet from the north side of the car? A. Yes. Q. And Grant Marsh was standing at the north side of the car? A. He came up on there then. Q. Oh, he (Marsh) came up on the ties? A. Yes, sir. Q. Where had he been first before he came up on the ties? A. He was standing down on the edge of the—Q. (interrupting). He was not standing on the ties, but he was standing down on the flat car, some distance from them? A. Well, about the middle, as I tell you, of the pile. Q. About how far in feet would that be from you? A. I would say about four or five feet, or six. . . . Q. And that car would be approximately six or seven feet wide on top, the flat car? A. Well, yes; it is seven or eight feet wide. Q. And you were north of the middle of the car? A. Yes, sir. Q. And when Marsh came rushing up there and brushed against you, you fell off the south side of the car? A. Yes, sir. Q. And then his brushing against you caused you to fall over about, probably, five feet, or four feet, at least, off the side of the car? A. Yes, sir. Q. He struck you with that much violence? A. Yes, sir. Q. Or, as you say, accidentally brushed against you? A. Yes, sir. . . . Q. But he just simply came violently up there and brushed against you, so that you fell from north of the middle of the car off to the south side? A. Yes, sir. Q. That is what you mean to tell the jury, is it, Mr. Baker? A. Yes, sir.

"Q. And you say now that you don't know whether he (Marsh) did it wilfully, or purposely, or whether it was accidental? A. Well, I don't know whether it was, or not. Q. And you couldn't say? A. No. . . . Q. And you would not tell the jury that he did not use his hands in shoving you? A. No, I would not. Q. In fact, he did, didn't he? A. I don't know. I don't think he did. Q. You were looking at him, you were facing him, when the collision between the two of you took place, weren't you? A. Yes, but when he would brush against you and push you off, why, you couldn't hardly tell. Q. He would have to push you about five feet in order to push you off, wouldn't he? A. Yes, sir, when you stumble and fall. Q. Did he continue to push you all the distance of the five feet? A. Well, one push was enough. Q. And it was with such violence that you went the distance of the five feet. across that car, five feet or more across the car and went off the south side? A. Yes, sir. Q And you didn't lose your balance before you fell from the car, because you lit on your feet, didn't you? A. I whirled. If I hadn't whirled, I would have went right on my head. Q. You mean from the time he touched you? A. Yes, sir. . . . Q. You probably took one or two steps before you went off the car, didn't you? A. Why, probably I did, by stumbling. Q. And when you came off the car, you jumped and lit on both feet? A. Yes, sir, I lit on both feet."

Re-direct examination: Q. "Mr. Baker, do I understand that you were standing on top of some ties at the time you went off there? A. Yes, sir. Q. And tell the jury about how many thicknesses of those ties were there lying on the floor of this flat car that you was on? A. Well, there must have been four or five thicknesses. Q. Four or five layers? A. Yes, sir. Q. You said something about them being wet and slick? A. They are creosoted ties, is what they are, and that is very slick. Q. Oily? A. Yes, sir. . . .

"Q. Now tell the jury this: As he (Marsh) brushed by you, did he touch you, did any part of his person or body, or arm, or hand touch you? A. Yes, sir; brushed my arm. Q. Tell the jury whether or not he touched you as he pushed by you? A. Yes, he did. Q. And tell the jury what effect that had on your body as he brushed by you and pushed you. A. Well, it throwed me out of my balance. Q. And then what happened when it throwed you out of your balance? A. And then I was so close to the edge of the ties that I could not catch myself."

Re-cross-examination: "Q. You stated just before the noon hour that you didn't know, didn't you, whether he (Marsh) did it accidentally or purposely? A. Well, of course, I don't know, but I have an opinion. Q. Yes, but you don't know, and you are not going to tell the jury now, whether he did it purposely, or accidental-

ly, are you? A. Well, it looks to me as though it was carelessness. Q. But that is not answering directly, Mr. Baker, I say, you are not telling this jury that he did it just accidentally, and not purposely, at this time, are you? A. Not accidentally. Q. Yes, you don't know whether he did it accidentally or purposely? A. No, sir; no, sir.''

Plaintiff testified that he had worked under the defendant carrier's foreman, Grant Marsh, for a period of about thirteen years. The testimony of plaintiff discloses that he was about sixty-one years of age at the time of his injury, and his life expectancy, according to the mortality table in evidence, was 13.47 years. He testified that he was earning an average wage of $2.70 per day at the time of his injury. Evidence also was adduced by plaintiff tending to show that the railroad track of the defendant carrier, in the vicinity of Osborn, Missouri, which the section gang, whereof plaintiff was a member at the time of his injury, were engaged in repairing and maintaining, and into which railroad track the new ties were to be placed, was being used by the defendant carrier in the transportation of freight and passengers from one state to another, and therefore such railroad track, with respect to which plaintiff was working at the time of his injury, was an instrumentality of interstate commerce.

The plaintiff proffered the testimony of no other witness than himself with respect to the cause and circumstances of his injury. Three medical witnesses testified on behalf of plaintiff as to the nature, extent and permanency of his injuries.

The testimony of plaintiff's medical witnesses discloses that plaintiff suffered severe and painful injuries as the result of his fall from the flat car. His principal injuries were described by medical witnesses as a dislocation of the right ankle, a fracture of the fibula bone in the right leg, and an impacted fracture of the heel bone of the right foot. The impacted fracture of the right heel bone resulted in a portion of the heel bone being displaced and driven into the flesh of the foot. The fracture of the fibula bone had healed at the time of the trial, which was fourteen months after plaintiff's injury, but the attending surgeons had not succeeded in repairing the impacted fracture of the heel bone. All of the medical witnesses testified that the injury to the right foot is permanent, and that plaintiff probably will never be able to bear his weight upon the right foot, or to use the foot in walking and working, and that the injury will result in a permanent deformity and inability to use the foot. One of the medical witnesses expressed the positive view that amputation of the right foot is the only means of affording relief to plaintiff, and that any attempt by plaintiff to use the foot in walking may likely result in sloughing of the bones, a breaking down

of the tissues, and the setting up of a gangrenous condition, by reason of impaired circulation in the foot. Several X-ray pictures of the right foot were taken shortly after plaintiff was injured, and other X-ray pictures were taken immediately before the trial of plaintiff's action, which pictures, according to the testimony of the medical witnesses, show a gradual decalcification of the bones of the right foot, and a disappearance or absorption, to a large extent, of the lime salts which give normal hardness to the bones. Inability to use the foot has resulted in atrophy of the muscles of the right leg, which condition is progressive, according to the testimony of the medical witnesses. The injury has also resulted in ankylosis of the right ankle joint, so that there is no sidewise movement of the ankle joint. Measurements taken by one of the medical witnesses show a half inch shortening of the right leg, and a shrinking of the calf of the leg. The attending physicians testified that plaintiff had suffered much pain because of his injury, and that the pain and suffering had resulted in a highly nervous condition. The reasonable inference to be drawn from the testimony of the medical witnesses is that plaintiff will be a hopeless cripple for the remaining years of his life, and that he may never be able to use the right foot in walking, and in working, or even to bear his weight upon the foot, and that he will likely suffer continuous pain therefrom so long as he lives.

The defendants proffered no evidence on the trial, and the individual defendant, Grant Marsh, did not testify as a witness in his own behalf, or in behalf of his principal, the defendant railroad carrier.

Peremptory instructions, in the nature of demurrers to plaintiff's evidence, were requested by each of the defendants, and were refused by the trial court. No other instructions were tendered or requested by defendants. The cause was submitted to the jury under five instructions, all of which were given at the request of plaintiff.

The jury returned a unanimous verdict in favor of plaintiff and against both defendants, assessing plaintiff's damages at the sum of $10,500, and judgment was duly entered in accordance with the verdict. Each defendant, in due time, filed a separate motion for new trial and a separate motion in arrest of judgment, which motions were overruled by the trial court. Defendants were allowed an appeal to this court from the judgment entered upon the verdict.

I. Appellants assign error in the refusal of their peremptory instructions, in the nature of demurrers to plaintiff's evidence. It is urged by appellants that the testimony of plaintiff (who was the only witness who testified as to the causes and circumstances

of his injury) is too indefinite, uncertain, and contradictory to have warranted the submission of the case to the jury, and is so insufficient and lacking in probative force as not to amount to substantial proof of negligence on the part of the defendant carrier's foreman, Marsh. The appellants argue that, viewing the testimony of plaintiff in any aspect, it must be held, at most, merely to show that plaintiff's injuries were occasioned either by an accidental collision between the foreman and plaintiff, or by an intentional and wilful assault by the foreman upon plaintiff, for either of which causes the appellants claim they are not actionably liable under the Federal Employers' Liability Act, as interpreted and applied by the Federal courts. It is the uniform holding of the Federal courts, in proceedings brought under the Federal Employers' Liability Act, that *negligence* of the railroad carrier, or of its employee and agent acting in the course and scope of his duties, is essential to a recovery under the act, and that such negligence is an affirmative fact which plaintiff must establish by his proof. [New Orleans & Northeastern Railroad Co. v. Harris, 247 U. S. 367, 371, and cases there cited.] In view of the Federal decisions, it follows that, unless the testimony of plaintiff herein is sufficiently substantial to establish *negligence* upon the part of the defendant railroad carrier, and its foreman and agent, the defendant Marsh, then plaintiff is not entitled to a recovery, and the trial court should have given the peremptory instructions requested by each of the defendants.

Allowing to plaintiff every favorable inference of fact to be drawn from his testimony, as we must do in passing upon a demurrer to the evidence, and viewing plaintiff's testimony as a whole, we cannot say, as a matter of law, that his testimony tends to show that his fall from the flat car was caused by a mere accidental collision between the foreman and plaintiff. It is true that plaintiff, while under a close cross-examination by defendants' counsel, answered once or twice that he thought that the collision may have been "accidental." It is also true that plaintiff testified that, shortly after the occurrence, the foreman had said, in addressing the plaintiff, that "he was sorry that he had done that, but didn't aim to do that; it was an accident that he had done that." However, it is clear to our minds that plaintiff, when so testifying, was not using the word "accidental" in any legal or technical sense and meaning, but that plaintiff employed the word "accidental" only as a means of expressing the thought, either that the collision may not have been wilful and intentional on the part of the foreman, or that the foreman may not have anticipated, as the full consequence of the foreman's act, that the plaintiff would fall from the flat car onto the ground below. While the word "accident" is sometimes used in a popular sense or acceptation as denoting an occurrence which

arises without intent or design, when the word is applied to the law of negligence it signifies an occurrence or event proceeding from an unknown cause, or from a known cause without human agency or fault. [Hogan v. Public Service Co. (en banc), 322 Mo. 1103, 1115.] In our view, no reasonable or fair inference can be drawn from plaintiff's testimony that the collision between the foreman and plaintiff was purely and wholly accidental, and arose without human agency or fault.

On the other hand, the testimony of plaintiff, when viewed as a whole, may well be deemed to justify the reasonable inference of fact that the act of the foreman, in pushing or brushing against the plaintiff, was wilful and intentional on the part of the foreman. Plaintiff's testimony tends strongly to show that the foreman was displeased and angry because of the manner in which plaintiff had placed one of the ties upon the pile. Addressing plaintiff by a vile and obscene epithet, the foreman ordered plaintiff to replace the tie upon the pile, which order plaintiff said he obeyed by placing the tie where the foreman wanted it. When plaintiff rebuked the foreman for calling him a vile name, the foreman said to plaintiff, "If you can't do better, get on the ground;" whereupon the foreman "rushed up and brushed against" plaintiff with such violence as to throw plaintiff off his balance, and to precipitate his body a distance of four or five feet toward the south side of the flat car, thereby causing plaintiff to fall from the car onto the ground below. The plaintiff testified further that the foreman was "out of humor" and angry at the time of the occurrence. Plaintiff positively denied that he had engaged in any altercation with the foreman, or that he gave the foreman any provocation for rushing up and brushing against him. The inference derivable from plaintiff's testimony is not refuted that the foreman was overseeing and directing the plaintiff, and other employees of defendant railroad carrier, in the loading of the flat car and in the piling of the ties thereon, and that the foreman was acting in the course of his duties, and in the furtherance of his employer's business, at the time of the occurrence in controversy. Such act or conduct of the foreman in rushing up and brushing against plaintiff, although it be wilful and intentional on the part of the foreman, and although it amount to an assault upon the plaintiff, is held to constitute "negligence" within the purview of the Federal Employers' Liability Act, and to render the foreman's employer, the railroad carrier, actionably liable for injuries suffered by an employee of the railroad carrier, and resulting from such "negligence" of the railroad carrier's foreman. [Jamison v. Encarnacion, 281 U. S. 635, 50 Sup. Ct. Rep. 440.]

In the Jamison case, supra, the plaintiff brought an action in the Supreme Court of New York to recover damages for personal injuries, invoking the provisions of the Federal Merchant Marine Act, by the terms of which act the Federal Employers' Liability Act is made to apply to actions at law for the recovery of damages for personal injuries suffered by any seaman. Plaintiff was employed by defendant as a member of a gang or crew loading a barge lying at Brooklyn, New York, in the navigable waters of the United States. Defendant's foreman was in charge of the crew of which plaintiff was a member, and, while plaintiff was upon the barge engaged with others in loading it, the defendant's foreman struck and seriously injured him. The evidence justified the inference that the foreman was authorized by the defendant employer to direct the crew and to keep them at work, and that the defendant's foreman assaulted plaintiff without provocation, and to hurry plaintiff with the work in which he was engaged under the foreman's orders and direction. A judgment of the trial court, entered in accordance with the verdict of a jury, allowing plaintiff recovery for his injuries, was affirmed by the Court of Appeals of New York (Encarnacion v. Jamison, 251 N. Y. 218), and the cause came before the Supreme Court of the United States on writ of certiorari. It was contended by the defendant employer that the assault by the foreman upon plaintiff was a wilful and intentional act, and therefore was not "negligence" under the terms and provisions of the Federal Employers' Liability Act. In denying such contention, and in affirming the judgment of the New York Court of Appeals, the Supreme Court of the United States, speaking through Mr. Justice BUTLER, said: "Section 1 of the Federal Employers' Liability Act (45 U. S. C. A., sec. 51) provides: 'Every common carrier by railroad while engaging in [interstate] commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier.' . . . The question is whether 'negligence' as there used includes the assault in question. . . . 'Negligence' is a word of broad significance and may not readily be defined with accuracy. Courts usually refrain from attempts comprehensively to state its meaning. While liability arises when one suffers injury as the result of any breach of duty owed him by another chargeable with knowledge of the probable result of his conduct, actionable negligence is often deemed —and we need not pause to consider whether rightly—to include other elements. Some courts call willful misconduct evincing intention or willingness to cause injury to another gross negligence. [Citing authorities.] And it has been held that the use of excessive

force causing injury to an employee by the superintendent of a factory in order to induce her to remain at work was not a trespass as distinguished from a careless or negligent act. [Richard v. Amoskeag Mfg. Co., 79 N. H. 380, 381.] While the assault of which plaintiff complains was in excess of the authority conferred by the employer upon the foreman, it was committed in the course of the discharge of his duties and in furtherance of the work of the employer's business. As unquestionably the employer would be liable if plaintiff's injuries had been caused by mere inadvertence or carelessness on the part of the offending foreman, it would be unreasonable and in conflict with the purpose of Congress to hold that the assault, a much graver breach of duty, was not negligence within the meaning of the act. [Johnson v. Southern Pac. Co., 196 U. S. 1, 17; Schlemmer v. Buffalo, R. & P. Ry., 205 U. S. 1, 9, 10.] Judgment affirmed.''

It is further argued by the appellants herein that the collision between the foreman and the plaintiff may have occurred because plaintiff stepped so closely in front of the foreman that the latter could not avoid the collision; or, that one, or both of them, slipped upon a slick tie, causing them to collide; or, that one, or both of them, stepped upon an insecurely placed tie, causing the collision between them. Proceeding upon such premise, appellants invoke the well known rule of law that, ''if the accident might have resulted from more than one cause, for one of which the master is liable and for the other he is not liable, it is necessary for the plaintiff to prove, in the first instance, that the injury arose from the cause for which the master is liable, for it is not the province of a court or jury to speculate or guess from which cause the accident happened.'' [Goransson v. Mfg. Co., 186 Mo. 300, 307, and cases cited.] But we find nothing in plaintiff's testimony to indicate, or to raise any reasonable inference, that the collision between the foreman and plaintiff may have resulted from any of the supposed and purely conjectural causes so premised by appellants. Furthermore, when there is substantial evidence that a circumstance resulting in injury occurred in one of two or more ways, such evidence does not present a case of mere guess or conjecture. [Conner v. Railway Co., 181 Mo. 397, 411; Solomon v. Light & Power Co., 303 Mo. 622, 640; Thompson v. City of Lamar, 322 Mo. 514, 538.] In the Conner case, supra, we said: ''If there is substantial evidence tending to show that an accident occurred in any one of two or more ways, or any other number of ways, while the burden rests upon the plaintiff to establish such cause of the accident as would render the defendant liable, it by no means presents a case of mere conjecture; but is a question of fact, which should be submitted and determined by the triers of the facts. We only enter the field of conjecture

in the absence of proof; when proof enters, conjecture disappears.''

Moreover, the foreman, Marsh, notwithstanding that he is a party defendant in the instant action, failed to testify as a witness on the trial. The full circumstances which brought about and resulted in plaintiff's injury certainly must have been within the knowledge of the defendant Marsh, and yet he did not see fit to controvert or refute plaintiff's testimony respecting the circumstances, or to give the court and jury his own version of the circumstances, which resulted in plaintiff's injury. The failure of a party having knowledge of facts and circumstances vitally affecting the issues on trial to testify in his own behalf, or to call other witnesses within his power who have knowledge of such facts and circumstances, raises a strong presumption and inference that the testimony of such persons would have been unfavorable and damaging to the party who fails to proffer the same. [Kame v. Railroad Co., 254 Mo. 175, 194; Murrell v. Railroad Co., 279 Mo. 92, 112; McCord v. Schaff, 279 Mo. 558, 565; State ex rel. v. Trimble (Mo. Sup.), 260 S. W. 1000, 1003.] As was said by this court, in State ex rel. v. Trimble, supra: ''It is a rule of evidence that where one party raises an inference by the testimony in his favor and the knowledge of the truth of such inference lies in the knowledge of the other party, the inference may be taken as the fact, if the other party remains silent and does not rebut it.''

We are of opinion that the testimony of plaintiff is amply sufficient and substantial to have warranted the trial court in submitting to the finding and determination of the jury, as an issue of fact, whether the foreman, Grant Marsh, negligently jostled, pushed, or ran or moved against, the plaintiff, and thereby directly and proximately occasioned plaintiff's injury. The trial court, therefore, committed no error in refusing the peremptory instructions requested by each of the defendants.

II. Appellants contend that the trial court erred in allowing plaintiff to amend his petition by inserting therein the word ''push,'' and in overruling defendants' motions to strike out the amendment, and in refusing defendants' application for a continuance of the trial of the cause. Such assignment of error is predicated upon the claim that the interlineation in the petition of the word ''push'' completely changed the cause of action from that declared upon in the original petition, and amounted to a departure from the original cause of action. Both the original and the amended petitions ground plaintiff's right of recovery wholly and solely upon the *negligence* of the foreman, Marsh, while acting in the line of his duties to his employer, the defendant railroad company. Appellants contend that the inter-

lineation of the word "push" in the petition necessarily carries the implication that the act of the foreman, complained of by plaintiff, was a wilful and intentional assault, and that such implication is incompatible and inconsistent with the charge of *"negligence"* upon the part of defendants. As stated in the preceding paragraph of our opinion, the Federal Supreme Court has lately held that a wilful and intentional assault, by the foreman of a railroad carrier while acting in the course and discharge of his duties and in furtherance of the employer's business, upon a servant and employee of the railroad carrier who is working under the direction and orders of the foreman, constitutes "negligence" within the purview and meaning of the Federal Employers' Liability Act. [Jamison v. Encarnacion, 281 U. S. 635, supra.] Assuming, therefore, as is contended by appellants, that the word "push" carries the implication of an intentional and wilful assault, the interlineation of said word, by way of amendment to the original petition, does not change the cause of action as declared upon in the original petition, nor does it amount to a departure. As was said by our court, in Montague v. Railway Co., 289 Mo. 288, 297: "Here and elsewhere, as the cases attest, the rule obtains that there is no departure where the matter subsequently alleged, fortifies or strengthens the position in the original pleading. This may be done by restating the cause more fully or in a more specific manner. [7 Stan. Cyc. Proc., page 214.]"

But we think that the interlineation of the word "push," after the word "jostle" in the original petition, added little, if anything, to the causal charge of the original petition. The words "jostle" and "push" are synonyms. The verb "jostle" is defined as "to *push; to push* or crowd in passing." [Webster's New International Dictionary.] The effect of the amendment of the original petition, by inserting the word "push" after the word "jostle," did not work a departure, and appears to have been harmless and inconsequential in so far as apprising the defendants of the act of negligence against which defendants were called upon to defend.

An application for a continuance upon the ground of surprise is addressed largely to the sound discretion of the trial court, and such discretion will not be disturbed on appeal, unless grossly abused. [13 C. J. 174; Mooney v. Gasoline & Oil Co., 317 Mo. 1255, 1282; Laumeier v. Laumeier, 308 Mo. 201, 213; Seelig v. Railway Co. (Mo. Sup.), 230 S. W. 94, 103.] We find no such abuse of discretion in the instant case as to convict the trial court of error in denying the applications for a continuance of the trial, requested by defendants because of the interlineation of the word "push" in the causal charge of the original petition.

III. It is claimed that the trial court erred in overruling the objections interposed by defendants to certain questions, propounded

to plaintiff by his counsel, which called for the opinion and conclusion of plaintiff as to whether the act and conduct of the foreman, Marsh, was negligent or intentional. The particular questions of which appellants complain were propounded to plaintiff during his redirect examination, and while the form of the questions might be said to have called for a conclusion of the witness, yet the record shows that the witness did not answer the questions by giving his opinion or conclusion. For instance, the question was asked, ''Now you were asked something about how Grant Marsh came to do this; have you a judgment as to in what manner he (Marsh) did it?''; and the plaintiff answered as follows: ''Well, he brushed me off the car '' Moreover, it appears from the record that, during the cross-examination of plaintiff, counsel for defendants repeatedly asked plaintiff to give his opinion or conclusion whether the foreman's act in brushing against plaintiff was intentional and wilful, or whether the foreman's act was accidental. Counsel for defendants, upon cross-examination of plaintiff, was persistent in his efforts to force the plaintiff to state his opinion or conclusion respecting the motives in the foreman's act. Defendants having adopted such method of cross-examination, by repeatedly calling upon plaintiff to state his opinion and conclusion respecting the motives of the foreman, the defendants certainly could not have been harmed if plaintiff had stated his conclusion in answer to similar questions asked by his own counsel upon his redirect examination. But, as we have just said, plaintiff stated no conclusion or opinion in answering the questions propounded on his redirect examination. The error in the form of the questions complained against by appellants, if any there be, was harmless, and worked no prejudice to appellants. The assignment of error is overruled.

IV. Error is assigned in the giving of two instructions at the request of plaintiff.

Instruction No. 2 was the main instruction, and submitted plaintiff's theory of the case. The instruction required the jury to find and believe from the evidence that both the plaintiff and the defendant railroad company were engaged in interstate commerce at the time of plaintiff's injury; that the defendant, Grant Marsh, was the foreman of the defendant railroad company in charge of, and supervising, the work in which plaintiff was engaged; and that plaintiff was ordered and required by said foreman to work and to stand upon the flat car in question, and to assist in the work of piling railroad ties on said flat car. The remaining portion of the instruction authorized the jury to return a verdict for plaintiff, and against both

defendants, if the jury (in addition to finding the foregoing facts) shall further find and believe from the evidence that, at the time and place in question, "plaintiff was so on said flat car and so assisting in said piling of said ties, in pursuance of said orders and directions (if he was), and that while so engaged, the defendant, Grant Marsh, then and there acting in the line of his duties to defendant railroad, and directing and supervising the said work (if he was), did *negligently* jostle, run against, push or move against plaintiff, and that plaintiff was thereby, and as a proximate and direct result thereof, caused to fall from said car and said ties onto the ground and receive injury." Another given instruction properly defined, for the benefit of the jury, the meaning of the terms "negligence" and "negligently."

Appellant claims that there is no substantial proof of negligence on the part of the defendants to support the giving of Instruction Number 2, and that the instruction permits a recovery for a wilful and intentional assault committed by the foreman, Marsh, upon the plaintiff. The criticisms leveled against the instruction, Number 2, are fully answered in Paragraph I of this opinion, wherein we have ruled that, viewing the act of the foreman in jostling, pushing, or moving against the plaintiff as amounting to a wilful and intentional assault, nevertheless such act of the foreman is "negligence" under the Federal Employers' Liability Act, as lately construed and applied by the Supreme Court of the United States in the case of Jamison v. Encarnacion, 281 U. S. 635. We find that there is sufficient and substantial proof of negligence upon the part of the defendant railroad company and its foreman, the defendant Marsh, to support the instruction, Number 2. The scope of the instruction is well within the pleadings and the evidence, and we perceive no error in the giving of the same.

Complaint is made against plaintiff's Instruction No. 1, prescribing the measure of damages. The instruction reads: "The court instructs the jury that if you find a verdict for plaintiff under the evidence and the instructions herein, and if you find and believe from the evidence that plaintiff was at all times referred to in the evidence in the exercise of ordinary care for his own safety, then in estimating his damages, if any, you may consider any pain of body and anguish of mind which the evidence shows he has suffered, or is reasonably certain to suffer in the future, by reason of said injury, and any loss of earnings which you may believe from the evidence plaintiff has sustained or is reasonably certain to sustain in the future by reason of said injury (if any), and for any *crippling, apart from pain of body and anguish of mind and apart from loss of earnings* (if any) *which the evidence shows he has sustained or will be reason-*

*ably certain to sustain in the future* by reason of said injury (if any), and you may take into consideration the character and nature of plaintiff's injury (if any) as shown by the evidence, and whether permanent or not, and if you find for plaintiff you will assess his total damages at such sum as you believe from the evidence will be a fair and reasonable compensation to him for his said injuries as shown by the evidence (if any) caused by the said negligence (if any) of defendants and shown by the evidence, but the total amount of your verdict shall not exceed, in all, the sum of $25,000.'' [Italics are our own.]

The ground of the criticism urged against the instruction is that it ''permits the recovery of double damages, or permits a duplication of recoveries.'' It is the contention of appellants that *''crippling,''* as such word or term is used in said instruction, is not a separate and independent element of the damages which are properly recoverable by plaintiff, but is included within the elements of bodily pain, mental anguish, and loss of earnings, for which latter elements the instruction authorizes a recovery.

A like contention with respect to a somewhat similar instruction was before this court, en banc, in Banks v. Morris & Co., 302 Mo. 254, 270. The instruction complained against in the Banks case permitted a recovery of damages: (1) for pain of body and anguish of mind which plaintiff had suffered, and is reasonably certain to suffer in the future, by reason of her injuries; (2) for loss of earnings of her labor which plaintiff had suffered, and is reasonably certain to suffer, by reason of her injuries; and (3) for ''permanent physical disability'' which plaintiff has suffered by reason of her injuries. In ruling against the contention, we said in the Banks case (l. c. 270, 271): ''The instruction is further criticized on the ground that it authorized a duplication of the elements of damages. Viewed from the standpoint of compensation the phrase, 'permanent physical disability,' as used in the fourth paragraph of the instruction, unquestionably carries with it implications of future pain and suffering and future loss of earning power, both of which are covered by the first and third paragraphs. The meaning directly conveyed by the words, physical disability, however, is the impairment of any of the normal functions of the body. In the instant case the evidence tended to show that plaintiff's right leg was shortened and the small bone therein incurably fractured, by reason of which the normal function of the leg was permanently impaired. Such impairment might or might not cause future pain, it might or might not cause a diminution of earning power; but wholly independent of these possible consequences it was an element which it was proper for the jury to consider in fixing plaintiff's compensation. If the jury was possessed of ordinary intelligence and a

sense of fairness, as we must assume, it is hardly conceivable that after assessing, under the first and third paragraphs of the instruction, amounts to be allowed for future pain and suffering and for loss of earning power, they would make additional awards on these same grounds when they came to consider plaintiff's permanent physical disability. The instruction was not accurately drawn, but it cannot reasonably be held to have led the jury into error.''

In Eberly v. Railway Co., 96 Mo. App. 361, 370, the Kansas City Court of Appeals, in passing upon a like contention, said: ''The defendant finally complains of the action of the court in giving the plaintiff's fifth instruction, relating to the measure of damages. It authorized the allowance of damages for these elements: (1) Past bodily pain and mental anguish. (2) Future bodily pain and mental anguish. (3) Past loss of earnings. (4) Future loss of earnings. (5) Expenses for medical attention. (6) For any physical disabling *apart* from pain of body and anguish of mind and *apart* from loss of earnings and disability to labor. It is thus seen that the five first-named elements which the jury were authorized to consider in allowing the damages were not included in the sixth. The 'physical disabling' for which they were authorized to allow damages was *apart* or independent of the preceding specified elements. The rule is that in cases of this kind the damages recoverable must be limited to compensation for pain suffered or that will likely be suffered in the future; time or earnings lost, or that may be lost; expense of being cured, and permanent injuries. [Jacquin v. Cable Co., 57 Mo. App. loc. cit. 336-7, and the cases there cited.] This instruction defined the limits within which the jury were to be restricted in their inquiry into the damages to be allowed, and is not therefore fairly subject to defendant's criticism.''

The term or word ''crippling,'' as used in the criticised instruction in the instant case, is the equivalent of the words ''physical disability,'' as used in the instructions under consideration in the Banks and Eberly cases, supra. The verb ''cripple'' is thus defined in Webster's New International Dictionary: ''To deprive of the use of a limb, particularly of a leg or foot; to deprive of strength, activity, or capability for service or use; to disable.'' The evidence herein strongly tends to show that the normal use and function of plaintiff's right foot is permanently impaired, and that he may never be able to use the foot in walking, or even to support and bear the weight of his body. The ''crippling'' of plaintiff was a proper element for the jury to consider in arriving at his damages. The instruction complained against in the instant case limited the jury in their consideration of the ''crippling,'' as an element of plaintiff's damages, by specifically advising them

that they must consider such element *apart* and independently from the elements of pain of body, anguish of mind, and loss of earnings. If the jury obeyed the directions of the instruction, as we must assume they did, there was no room for a duplication of the allowances made for each separate and independent element of damage. We do not see how the instruction could have led the jury into error in assessing plaintiff's damages. The assignment of error is therefore overruled.

V. Lastly, it is urged that the amount of the verdict is so excessive as to indicate that the verdict is the result of passion, prejudice and sympathy on the part of the jury. In the light of the testimony of the medical witnesses, which tended to show that, in addition to certain minor injuries, plaintiff has suffered a severe and painful injury by reason of the impacted fracture of the heel bone of the right foot, an injury which the attending physicians testified they have been unable to cure and which has seemingly resulted in a permanent and incurable deformity and impairment of the use of the right limb, we cannot say that the amount of the verdict is excessive. The defendants proffered no countervailing evidence respecting the severity and permanency of said injury. The record shows that the deformed foot was exhibited to the view of the court and the jury, an exhibition which is necessarily denied to an appellate court. It was the peculiar province of the jury to determine the extent and permanency of the plaintiff's injuries, and the damages to be assessed therefor. [17 C. J. 1057, 1058; Hoover v. Railway Co. (Mo. Sup.), 227 S. W. 77, 79; Grott v. Shoe Co. (Mo. Sup.), 2 S. W. (2d) 785, 790.] An appellate court will not interfere with an award of damages unless the amount is "so glaringly unauthorized by the evidence as to shock the judicial sense of right or compel a conviction that the verdict was the result of prejudice, passion or bias." [Grott v. Shoe Co., supra.] There is substantial evidence in the record to support the amount of the award, and we find nothing in the record to convince us that the jury were actuated by bias, passion or prejudice in assessing the amount of plaintiff's damages. Nor is the amount ($10,500) of damages awarded herein such as to shock the judicial sense of right.

Finding no reversible error herein, the judgment *nisi* must be affirmed. It is so ordered. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.