WALTER A. LAVENDER, Administrator of the Estate of CHARLES LEE HUNTER, Deceased, (Plaintiff) Appellant, v. ILLINOIS CENTRAL RAILROAD COMPANY, a Corporation, (Defendant) Respondent.— No. 41084.—219 S. W. (2d) 353.

Division One, March 14, 1949.

Motion for Rehearing or to Transfer to Banc Overruled, April 11, 1949.

*N. Murry Edwards* and *Ninina M. Edwards, Jr.,* for appellant.

*Watts & Gentry* for respondent; *C. A. Helsell* and *John W. Freels* of counsel.

[354] CONKLING, J.—Plaintiff, administrator of the estate of Charles Lee Hunter, a former employee of defendant, had a judgment for $15,000 upon the verdict of a jury in an action under the Federal Employers' Liability Act for damages for the alleged wrongful death of Hunter. The trial court thereafter sustained defendant's motion for judgment notwithstanding the verdict. Judgment was then entered for defendant. Plaintiff appealed and asks that his judgment be reinstated.

Hunter, a negro dining car waiter regularly employed by defendant, died about 30 hours after being shot while in defendant's dining car with a revolver held by another of defendant's dining car waiters, one McCampbell. The unfortunate occurrence happened as defendant's interstate train number 9 was leaving Chicago, Illinois, for the State of Florida, about 11:30 P. M., on March 28, 1942.

It was the theory of plaintiff's petition that defendant was negligent, in that, (1) its dining car crew negligently carried loaded pistols into the dining car and negligently caused a loaded pistol to be discharged while Hunter was nearby, (2) that defendant's dining car crew negligently pushed and shoved each other in a scuffle and negligently caused a loaded pistol to be discharged, and (3) that defendant negligently failed to furnish Hunter with a reasonably safe place to work in that defendant negligently *permitted* waiters to carry loaded pistols into the dining car and to scuffle, wrestle, push and shove each [355] other while Hunter was working nearby. Plaintiff submitted the above theories to the jury in his instructions 1 and 2.

Deceased was 18 years of age, unmarried and was survived by his parents and brothers. With others of his regular dining car crew (six waiters and four cooks—all negroes) he had worked into Chicago that evening arriving there about 9 P. M., on his regular dining car attached to one of defendant's trains, "The Sunchaser". During the short stay in Chicago Hunter had gone with McCampbell and one Peyton, another waiter of his regular dining car crew, to see some of McCampbell's friends. As permitted by defendant those three waiters, about 11:17 P: M., boarded their dining car at the 63rd Street Station as train No. 9 was leaving Chicago. This particular dining car crew were under orders from defendant to leave Chicago on train No. 9, "bed down" in their dining car, "dead-head" to Fulton, Kentucky, arise at 5 A. M., (near Cairo, Illinois) and start serving breakfast at 6 A. M., at Fulton. They were not paid for the time from Chicago back to Fulton. When they reached Chicago this crew left their baggage in the locker room of the dining car. They were under orders from their superintendent that when the train left Chicago on their extra movement they were to remove the tables from the dining car, place cots on the floor, change clothes and sleep until

5 A. M. Upon arising the cots were to be put away, tables replaced and preparations made for serving the morning meal at 6 A. M.

When Hunter, McCampbell and Peyton boarded the train at 63rd Street some of the tables had not been removed. McCampbell went to the locker room in the dining car, secured his handbag, brought it into the dining car proper and placed it on a table. Peyton did likewise. The train was moving south. McCampbell stood facing south. Peyton stood directly across the table from him facing north. Hunter was northwest of McCampbell and across the car. McCampbell testified Peyton had a gun in his hand. Only McCampbell saw Peyton have a gun. McCampbell took a loaded pistol out of his side overcoat pocket and started to place it in his handbag to put it away. Some of the waiters on the car started playing with each other, slapping and "goosing", in play. McCampbell testified that Peyton playfully "started pranking with his (gun) and when he hit my hand my gun went off and hit Charles (Hunter)"; that Peyton "started pranking" and either grabbed his (McCampbell's) gun or pushed it around about two feet so that it was pointing northwest from McCampbell. McCampbell's gun was accidentally discharged. The bullet struck Hunter in the chest. When he was shot Hunter was some distance away across the dining car sitting on a table and laughing. Hunter had nothing to do with a gun. Neither McCampbell nor Peyton had any intention of shooting Hunter, or any one else. McCampbell, Hunter and Peyton were good friends. McCampbell never had any quarrel with Hunter, never threatened him and felt very kindly toward him. The shooting was not intentional. Hunter was taken off the train as quickly as ambulance and hospital facilities were reached and died March 30, 1942 at Kankakee, Illinois. Hunter did not know McCampbell had a gun. Only the negro dining car crew were in the dining car when Hunter was shot.

It was not any part of McCampbell's duties "to handle a pistol". All that the defendant expected of McCampbell that night after he boarded the dining car was to make his toilet, undress and go to bed, and get up at 5 o'clock the next morning.

As explanatory of carrying a gun, McCampbell testified that early in January, 1942, while working as a dining car waiter for defendant, he had had trouble with one Hubbard, a negro dining car cook employed by defendant and then working regularly on McCampbell's car; that the trouble arose over a food order; that on that occasion Hubbard pointed a "two-barreled pistol" at him and told him (McCampbell) to get out of the pantry or he (Hubbard) would kill him; that he (McCampbell) after obtaining approval of his immediate superior, Mr. Miller, on January 6, 1942, by letter reported the Hubbard incident to Mr. Patterson, the general dining car superintendent in Chicago; that Mr. Patterson replied by mail on January 14, 1942 and [356] advised him (McCampbell) that: "I have taken action

which I am sure will prevent anything like this happening again'';
McCampbell testified that thereafter, ''I had the gun in my bag at
all times. I carried it at all times . . . in my work bag that I
carry my things in''; that ''I wouldn't have had it in my pocket
that night but . . . this cook who had threatened me was in an-
other car from me, and several of the boys made remarks he was going
to be waiting for me outside. That's why I put it in my pocket that
night . . . I never carried it in my pocket. . . . That was
the first time I had taken it out of my bag, that particular time''.

Immediately after the letter (of January 6, 1942) from McCamp-
bell to Mr. Patterson respecting the trouble with Hubbard, the latter
was transferred to another dining car crew. However, the train
(''The Sunchaser'') which that night (March 28, 1942) carried into
Chicago the dining car in which deceased and McCampbell regularly
worked, by circumstance carried also the dining car in which Hubbard
regularly cooked. But Hubbard was not on train No. 9 when Hunter
was shot.

McCampbell further testified that over a period of more than a
year he had seen waiters have a gun in his dining car; that he had
seen other waiters have a pistol four or five times in that period of
time; that ''it was sort of a practice''; that the waiters sometimes
pushed and wrestled when ''making down their beds''; that ''at any
intervals men are subject to play at all times''; that he had seen the
steward there when that was going on. The dining car steward, Mr.
Beverlin, had boarded the train in down town Chicago and had im-
mediately gone to bed in a forward Pullman car, and was asleep
before the train left the 12th Street Station in Chicago. After the
shooting Beverlin was awakened, immediately went to the dining
car and found McCampbell holding Hunter's head ''and giving him
rest''. Mr. Beverlin had not been in the dining car since he (Mc-
Campbell) came aboard the dining car at the 63rd Street Station.
The train conductor had not been in the dining car since the train
started from the downtown Chicago station. When McCampbell
boarded train No. 9 at the 63rd Street Station in South Chicago he
did not expect to meet Hubbard, and knew Hubbard had no business
on the train. When McCampbell took the pistol out of his pocket
after he was on the train he did so not to protect himself from Hub-
bard but to put the pistol away in his bag.

It does not appear from the record before us that defendant, or
any of its vice-principals, or that any one in authority for defendant,
ever had either actual or constructive notice of any of the dining
car crew ever having or carrying a pistol into the dining car before
that time.

While appellant contends in his brief that McCampbell's report of
the Hubbard trouble to Mr. Miller and McCampbell's letter to Mr.
Patterson were notice to defendant that guns were being carried into

the dining car we cannot reach that conclusion from the testimony in this record. There is not a word of testimony that McCampbell reported to either that Hubbard had a gun. He did not advise his superiors that he (McCampbell) had a gun. In any event Hubbard was transferred out of that dining car immediately after January 6, 1942. After that transfer McCampbell did not see Hubbard again until March 28, 1942, when by mere circumstance only, Hubbard's dining car happened to go into Chicago just ahead of McCampbell's car and attached to the same train ("The Sunchaser"). There is nothing in the record to indicate that defendant or any one for it ever knew or heard of any prior horseplay with pistols by any of the dining car crew. Nor is there any evidence of any prior horseplay with guns.

Other members of the dining car crew, Collins, Patton, Hilliard and Dixon were called as witnesses by defendant, but their testimony did not aid plaintiff's case. None of them had ever seen any of the dining car crew have pistols in the dining car before. They had generally observed or participated in "friendly horseplay, slap on the back or shove", when there was nothing else to do, but no one was ever hurt. One of them saw McCampbell, Hunter and Peyton board the car at 63rd Street Station, talking, playing, joking and teasing one another. One of them testified the steward on a prior occasion [357] had been present when the dining car crew, when bedding down, had indulged in harmless horseplay by pushing or shoving each other.

McCampbell intended simply to put the pistol into his handbag, Peyton interfered with his doing so and they engaged in friendly, sportive play best described as unnecessary and foolish horseplay. It was foolish because at least one of them had a gun in his hand. Unfortunately a laughing and innocent bystander suffered death. Hubbard had nothing to do with his death at all. Hubbard simply furnished McCampbell's excuse to own a gun.

█ In an action against an interstate common carrier by railroad under the Federal Employers' Liability Act for the injury or death of one of its employees while engaged in such commerce, the basis of any liability is that the injury or death result in whole or in part from the carrier's negligence. Liability must result from the carrier's negligence and cannot be based on the mere fact alone that an employee sustained injuries. The employer is not an insurer of the employee. 45 U.S.C.A. § 51, Wilkerson v. McCarthy, 1949, 69 S. Ct. 413, Tiller v. Atlantic Coast Line Railroad Co., 318 U. S. 54, 67, 63 S. Ct. 444, 87 L. Ed. 610, Eckenrode v. Pennsylvania Railroad Co., 164 Fed. (2d) 996, 69 S. Ct. Rep. 91, 335 U. S. 329, Wolfe v. Henwood, 162 Fed. (2d) 998, 332 U. S. 773. It is plaintiff's contention that the negligence of defendant in this case was that stated in the third paragraph of this opinion.

The gist of the negligence alleged is that, at the time of the shooting, defendant's employees carried loaded pistols into the dining car and in a scuffle negligently caused a pistol to be discharged, and, because defendant *permitted* waiters to carry such loaded pistols in the car and to scuffle and horseplay therein, Hunter was thereby furnished an unsafe place in which to work.

At the outset, the inquiry arises whether the shooting of Hunter occurred in the execution of defendant's work whether it was in the course of the discharge of McCampbell's duties and whether it was in the furtherance of the work of the defendant's business. If the shooting was not in the course of the discharge of McCampbell's and Peyton's duties and had no tendency to further the work of defendant's business the case is much simplified. Under the Federal Act and the Missouri law unless the shooting can be said to be within the scope of the employment and in furtherance of the railroad's business, the railroad is not liable. Osment v. Pitcairn, 349 Mo. 137, 159 S. W. (2d) 666.

In this case there is neither allegation nor proof that the shooting of Hunter occurred in the course of the employment of McCampbell and Peyton, either or both. Even under the Federal Employers' Liability Act a carrier is not liable for every act of an employee causing injury to another employee. Wolfe v. Henwood, supra. It is imperative that the act causing the injury shall have been committed while the employee at fault was prosecuting the carrier's business. When, of their own volition, to serve their own playful purposes, and not of any necessity arising from their work, railroad employees so step aside and out of the line of their duty as to engage in horseplay with loaded pistols they thereby suspend the relationship of employer and employees. It is not enough that the shooting complained of occurred during the hours these employees were on their regular dining car under the orders of defendant to be there. When employees so step aside and out of their employment the employer has no control and cannot control the inclination to exhibit human tendencies and propensities.

In order for the master to be liable, it is, of course, not necessary that the servant or servants at fault have the authority of the master to do the particular thing which was done. Under certain circumstances the master may be liable if the act of the servant was contrary to the master's express orders. But to hold the master liable the act must always have been done in furtherance of the master's business. Here the instrumentality was owned by McCampbell and the act was that of a former servant who had stepped out of the scope of his employment without notice to or [358] knowledge of the master. The act was one not to be reasonably anticipated.

When McCampbell and Peyton engaged in the horseplay which resulted in the accidental killing of Hunter nothing was being done

by them which was in the line of their duty as employees of the railroad. Nor was anything being done which was in the furtherance of the railroad's business.

We hold and rule, therefore, that under the instant facts, for this horseplay which resulted so unfortunately for Hunter there can be no liability upon this defendant. "The master is not liable for an injury occasioned by sportive acts or horseplay not in the scope and course of employment". See, Osment v. Pitcairn, supra, Gens v. Wagner Electric Co.; 326 Mo. 503, 31 S. W. (2d) 785, Pettigrew v. St. Louis Ore & Steel Co., 14 Mo. App. 441, Reeve v. Northern Pacific R. Co., 82 Wash. 268, 144 Pac. 63, L. R. A. 1915C, 37, 8 N. C. C. A. 167, Griffin v. Baltimore & Ohio R. Co., (W. Va.) 126 S. E. 571, 40 A. L. R. 1326, Dewing v. New York Central R. Co., 183 N. E. (Mass.) 754, Galveston H. & S. A. Ry. Co. v. Currie, 96 S. W. (Tex.) 1073, Texas Breeders & Racing Assn. v. Blanchard, 81 Fed. (2d) 382, International & G. N. R. Co. v. Cooper, 32 S. W. (Tex.) 517, American Railway Express Co. v. Tait, 100 Sou. (Ala.) 328, Sheaf v. Minneapolis, St. P. & S. S. M. R. Co., 162 Fed. (2d) 110, Atlantic Coast Line R. Co. v. Southwell, 48 S. Ct. 25, Davis v. Green, 260 U. S. 349, 43 S. Ct. 123, 67 L. Ed. 299, 35 Am. Jur. Master and Servant, § 429, p. 847, Rivenbark v. Hines, 180 N. C. 240, 104 S. E. 524, Jackson v. Chicago, R. I. & P. R. Co., 178 Fed. 432, and Smith v. Western Union Telegraph Co., (Mo. App.) 232 S. W. 480.

In his brief appellant contends that if the death of his decedent resulted from an assault upon him that defendant is liable. He cites such cases as Baker v. Chicago, B. & Q. R. Co., 327, Mo. 986, 39 S. W. (2d) 535, Jamison v. Encarnacion, 281 U. S. 635, 50 S. Ct. 440, 74 L. Ed. 1082 and Fletcher v. Baltimore & P. R. Co., 168 U. S. 135, 18 S. Ct. 35, 42 L. Ed. 411. But it is crystal clear from this record that there was no assault upon Hunter. McCampbell was Hunter's good friend. Hunter was kindly regarded by both Peyton and McCampbell. Hunter was merely sitting some distance away upon a table and laughing. Unfortunately he was merely an innocent bystander who was accidentally shot in useless and too often tragic horseplay with a loaded gun. Conceding the rule of the last above cited cases they have no application whatever to the instant facts. There was no assault upon Hunter. The Baker and Jamison case are not in point at all for reasons quickly apparent. The facts of the Fletcher case, too, readily distinguish it from the instant case.

Plaintiff contends that he made a jury issue in that reasonable care was not exercised to furnish Hunter a safe place in which to work. His specific contention in his brief is that "Hunter was shot on account of the unsafe condition of the waiters *being permitted* to carry loaded pistols and to shove, push and wrestle with each other in the dining car".

Plaintiff relies on Lillie v. Thompson, 332 U. S. 459, 68 S. Ct. 140, Lavender v. Kurn, 327 U. S. 645, 66 S. Ct. 740, and Anderson v. A. T. & S. F. R. Co., 333 U. S. 821, 68 S. Ct. 854. The facts of those cases so clearly and so quickly distinguish them that it is unnecessary to point to distinguishing features. In each case the railroad clearly required the employee to work in a hazardous place which under the existing circumstances the court held to be obviously an unsafe place in which to work.

In the instant case the railroad required plaintiff's decedent to bed down in this dining car (an obviously safe place) and there is no proof in this record that defendant, or any one for it, ever had actual or constructive notice, until after Hunter was shot, of any of this dining car crew (or anyone) having or carrying a loaded pistol into that dining car. Nor is there proof or inference "of the waiters *being permitted* to carry loaded pistols . . . in the dining car".

It is true that defendant had the duty to use reasonable car to furnish Hunter [359] a safe place in which to work. Bailey v. Central Vermont Ry. Co., 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1114. But there was no duty on defendant to search each member of the dining car crew (and their baggage) each time they came to work. Defendant was not an insurer of the safety of its employees. Defendant's obligation was not such as to impose liability for injury regardless of whether the injury was not reasonably to be anticipated or foreseen as a natural consequence of a failure to search each one. Wolfe v. Henwood, supra. The carrier's liability under the Act must be determined under the general rule which defines negligence "as a lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done". Wolfe v. Henwood, supra, Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S. W. (2d) 568.

The instant facts, measured by these standards of duty and care, do not show defendant failed to exercise due care to furnish deceased a safe place to work. The mere fact that these young negro waiters, when not at work serving meals, sometimes engaged in wholly harmless pushing or shoving or slapping at each other, as playful and lively young males have ever done since the beginning of time (Zabawa v. Overbeck Bros. Mfg. Co., 131 N. W. 826, 828 (Wisc.) ) did not require defendant to anticipate any horseplay with guns and the wholly accidental shooting by McCampbell of his friend Hunter. Nothing had ever occurred to compel defendant to so anticipate such an occurrence as to require a monitor or police authority constantly present to supervise their conduct and prevent such an occurrence.

The law does not require that a carrier anticipate or presume that employees will so step out of the scope of their employment as to do

what McCampbell and Peyton did here and negligence cannot be established by proof of such a single tragic act under these circumstances. Mere failure to anticipate and to prevent such a single and dangerous act falls far short of proving negligence and does not establish a failure to use reasonable care to furnish a safe place to work. Fletcher v. Baltimore & P. R. Co., supra.

The judgment of the circuit court is affirmed. It is so ordered. All concur.